IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROBERT BURR and
CHASSEUR REALTY INVESTORS – JACKSON, LLC          PLAINTIFFS

V.                                        CIVIL ACTION NO. 3:26-cv-349-DPJ-ASH

CHASSEUR REALTY INVESTORS, LLC and
ROBERT DOMINY                                          DEFENDANTS

**JURY TRIAL DEMANDED**

COMPLAINT

Robert Burr ("Burr") brings this action directly and, in part, derivatively on behalf of Chasseur Realty Investors – Jackson, LLC ("Fondren Hill", and together with Burr, "Plaintiffs") against Robert Dominy ("Dominy") and Chasseur Realty Investors, LLC ("Chasseur", and together with Dominy, "Defendants").

PARTIES

1.      Burr is an adult resident of Boynton Beach, Florida.

2.      Fondren Hill is a New Jersey limited liability company registered to business in Mississippi. This action is brought derivatively on Fondren Hill's behalf by Burr.

3.      Dominy is an adult resident of New Jersey and may be served through any means authorized by Federal Rule of Civil Procedure 4.

4.    Chasseur is a Maryland limited liability company and may be served through any means authorized by Federal Rule of Civil Procedure 4.

## JURISDICTION AND VENUE

5.    Jurisdiction is conferred by 15 U.S.C. sec. 78aa(a). This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the transactionally related claims arising under Mississippi law.

6.    Venue is proper in this District under 15 U.S.C. § 78aa because acts and transactions constituting the violations alleged herein occurred in this District, including the solicitation of investments in, and misappropriation and misuse of funds from, the Fondren Hill project located in Jackson, Mississippi. Defendants also transacted business in this District in connection with that project. Venue is also proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

7.    Chasseur "acquires, renovates and aggressively manages apartment communities" according to its website. In furtherance of that business, Chasseur and Dominy raise funds through securities offerings to private investors. On information and belief, Chasseur is owned by Dominy.

8.    In all transactions relevant to this case, Dominy and Chasseur identified one or more apartment buildings and formed an entity qualified to

do business in the applicable state (limited liability company or limited partnership) to acquire the apartment building.

9.    To fund the acquisition of the apartment building(s), Dominy and Chasseur prepared an offering memorandum for each project and sought investment from private investors by the sale of equity interests in the entity formed to own and operate the apartment building.

10.    Chasseur and Dominy first sought investment from Burr related to an apartment building in Jackson, Mississippi referred to as "Fondren Hill" in 2018. Burr invested in Fondren Hill in 2019. In total, Chasseur and Dominy sold equity interests to Burr in six projects as follows:

   a. Burr invested $100,000.00 in Fondren Hill ("Fondren Project") in 2019.

   b. Burr invested $100,000.00 in Chasseur Realty Investors - Williams, LP ("Williams Project") on June 24, 2021.

   c. Burr invested $200,000.00 in Chasseur Realty Investors - Valdosta Portfolio, LP ("Valdosta Project") on November 3, 2021.

   d. Burr invested $100,000.00 in Chasseur Realty Investors – The Flats, LP ("Flats Project") on November 2, 2022.

   e. Burr invested $100,000.00 in Chasseur Realty Investors - Woodlake, LP ("Woodlake Project") on January 18, 2023.

f. Burr invested $150,00.00 in Chasseur Realty Investors - The Drake, LP ("Drake Project") on May 18, 2023.

11. The offering memorandum for each investment, in each case titled "Confidential Information Package" (each, a "CIP"), contains an explanation and goals for the project, one page of risk disclosures, a copy of the limited partnership agreement[1] (each, a "Partnership Agreement") that each investor would execute a joinder to, a "sources and uses" of the investment funds for each apartment building that is part of the project, a proforma for the project, and various other diligence information on the project.

12. The sources and uses for the acquisition costs related to each project shows—on the "uses" side—the purchase price of the apartment building, reserves for improvements, loan fees, due diligence costs, closing costs and working capital, and—on the "sources" side—the amount that would be funded with debt and the amount that would be funded with cash from the investors. An example of one of these sources and uses calculations is shown below:

---

[1] Although each relevant agreement is styled as a limited partnership agreement, Fondren Hill was formed as a limited liability company.

4

**Chasseur Realty Investors**
**Valdosta Consolidated**
**Acquisition Costs**

| USES | | | PER UNIT |
|---|---|---:|---:|
| PURCHASE PRICE | $ | 15,100,000 | 52,431 |
| RESERVE FOR IMPROVEMENTS | $ | 449,440 | 1,561 |
| LOAN FEES | $ | 98,150 | 341 |
| DUE DILIGENCE | $ | 90,000 | 313 |
| CLOSING COSTS & WORKING CAPITAL | $ | 927,000 | 3,219 |
| **TOTAL USES** | $ | 16,664,590 | 57,863 |
| SOURCES | | | |
| FIRST MORTGAGE | $ | 9,815,000 | 34,080 |
| SECOND MORTGAGE | $ | - | - |
| PURCHASER'S CASH INVESTMENT | $ | 6,849,590 | 23,783 |
| **TOTAL SOURCES** | $ | 16,664,590 | 57,863 |

13.     Each sources-and-uses calculation contains a line item for "reserves for improvements" and a line item for "closing costs and working capital" and/or "acquisition fee".

14.     For the Fondren Project, the CIP, dated March 30, 2018, and provided to Burr by Dominy and Chasseur, provides that (i) $419,000 would be set aside for "Reserves for Improvements;" (ii) $100,000 would be set aside for "Closing Costs & Working Capital;" and (iii) $300,000 would be set aside as an "Acquisition Fee."

15.     For the Williams Project, the CIP provided to Burr by Dominy, provides that (i) $222,600 would be set aside for "Reserves for Improvements" and (ii) $400,000 would be set aside for "Closing Costs & Working Capital."

16.     For the Valdosta Project, the CIP, dated October 22, 2021, and provided to Burr by Dominy and Chasseur, provides that (i) $449,440 would be

5

set aside for "Reserves for Improvements" and (ii) $927,000 would be set aside for "Closing Costs & Working Capital."

17.    For the Flats Project, the CIP, dated October 23, 2022, and provided to Burr by Dominy and Chasseur, provides that (i) $400,000 would be set aside for "Reserves for Improvements" and (ii) $350,000 would be set aside for "Closing Costs & Working Capital".

18.    For the Woodlake Project, the CIP, dated January 2023, and provided to Burr by Dominy and Chasseur, provides that (i) $270,000 would be set aside for "Reserves for Improvements" and (ii) $380,000 would be set aside for "Closing Costs & Working Capital".

19.    For the Drake Project, the CIP, provided to Burr by Dominy and Chasseur in 2023, provides that (i) $173,840 would be set aside for "Reserves for Improvements" and (ii) $360,000 would be set aside for "Closing Costs & Working Capital" (these line items, collectively with the similar line items for the other projects detailed above, the "Project Reserve Funds").

20.    The CIPs did not authorize Chasseur or Dominy to take any acquisition or other fees out of the Project Reserve Funds, and the Project Reserve Funds not expended for appropriate closing costs should have been deposited into the bank account maintained for the applicable project. But, on information and belief, Chasseur and Dominy took undisclosed fees from the Project Reserve Funds at the closing for each project.

6

21.    At the time these representations were made, Defendants did not intend to segregate the Project Reserve Funds and, in fact, contemporaneously operated a centralized account structure through which investor funds were routinely commingled and used as a general fund for all of Chasseur's and Dominy's projects.

22.    And as would later be discovered, the Project Reserve Funds were, in fact, either never deposited in the bank account of the entity that acquired and operated the applicable project or were largely consolidated into Chasseur's/Dominy's bank accounts and commingled with funds related to Chasseur's and Dominy's other business dealings.

23.    The result was that the projects never had meaningful funds set aside for improvements or working capital, a critical element to the success or failure of this type of project and investment, despite the CIPs (including the Partnership Agreements) expressly providing otherwise.

24.    Further, the Project Reserve Funds were largely or never expended for the benefit of the relevant entity, and specifically, funds raised for "capital improvements" were never used for that purpose in any material manner, leaving the projects to rapidly deteriorate, both physically and financially. This was despite each Partnership Agreement requiring Section 17.1(h) that "[t]he Partnership will maintain records, books of account, financial statements, accounting records, bank accounts and other entity

documents separate from any other person or entity, including its general partners, principals and members; . . ." (Section 17.1(h)). And this was despite each Partnership preventing the partnership from "commingl[ing] the funds and other assets of the Partnership with those of any member, manager, general partner, principal or affiliate or any other person or permit any affiliate or constituent entity (other than the General Partner) independent access to its bank account;. . ." (Section 17.1(o)).

25.    In other words, the Partnership Agreements that Burr and the other limited partner investors were presented in the CIP expressly prohibited the commingling of funds.

26.    With little visibility into the operations of the entities, it was difficult or impossible for Burr or the other investors to discover these issues in the ordinary course.

27.    During the life of the Projects, Dominy sent quarterly letters to the investors that regularly presented an optimistic picture of each Project by using false or misleading financial reports that did not represent the true financial performance of the properties. The truth was that, during all relevant periods, significant repairs and improvements were not being made, occupancy in the apartments was generally below levels presented in the proforma, and the Projects were struggling.

28.    Chasseur and Dominy would sometimes include financial information with the quarterly letters but never provided cash basis financial reports on the 15th of every month, as required by the Partnership Agreements. Chasseur and Dominy also failed to provide audited financials on an annual basis.

29.    To string along the investors and avoid defaulting on the debt service obligations, Dominy and Chasseur were, on information and belief, using funds that they represented were to be reserved for one Project to cover expenses for other Projects. This allowed Dominy and Chasseur to stave off the complete collapse of the house of cards they had built for a period of time.

30.    Using their approach of robbing Peter to pay Paul, Dominy and Chasseur were even able to return some money to investors in the earlier Projects. Specifically, Burr received approximately $150,000.00 in total returns of his initial investments. Following that, regular distributions from operating profits never materialized because the businesses were not consistently or sufficiently profitable.

31.    Beginning in late 2024/early 2025, the quarterly letters from Chasseur and Dominy began to take on a more negative tone.

32.    In a letter dated January 22, 2025, Dominy indicated that the Valdosta Project was struggling due to lower-than-expected occupancy. As

would become clear, however, Dominy severely underplayed the severity of the situation.

33.    In a letter dated January 21, 2025, Dominy disclosed to the investors that he was attempting to sell the Fondren Hill apartment building, but that the Fondren Project was still overall financially stable.

34.    On April 15, 2025, Dominy sent out an investor letter for each of the relevant projects.

35.    In the April 15, 2025, Fondren Project letter, Dominy claimed that he had loaned over $1,000,000 to the Fondren Project and that, while not in default on the Fondren Project loan, the lender had placed the loan in lockbox because the Fondren Project failed to meet the financial covenants set forth in the loan agreement. Additionally, Dominy disclosed that his business associate, Mike Barrett, had loaned the Fondren Project an additional $200,000.

36.    In the April 15, 2025, Williams Project letter, Dominy disclosed that the Williams Project had defaulted on the Williams Project loan, that Dominy had loaned the Williams Project $150,000, and Barrett had loaned the Williams Project $10,000.

37.    In the April 15, 2025, Valdosta Project letter, Dominy disclosed that the Valdosta Project was in default with its lender, that Dominy had

loaned the Valdosta Project $165,000, and that Barrett had loaned the Valdosta Project $365,000.

38.    In the April 15, 2025, Flats Project letter, Dominy disclosed that the Flats Project was in default with its lender, that Dominy had loaned the Flats Project $281,000, and that Barrett had loaned the Flats Project $55,000.

39.    In the April 15, 2025, Woodlake Project letter, Dominy disclosed that Woodlake Project was close to default with its lender, that Dominy had loaned the Woodlake Project $178,000, and that Barret had loaned the Woodlake Project $40,000.

40.    In the April 15, 2025, Drake Project letter, Dominy disclosed that the Drake Project was behind one mortgage payment on its loan and that Dominy had loaned the project $272,000.

41.    These April 15, 2025, investor letters were the first time that Dominy disclosed to the investors that he had allegedly made loans to the projects, which taken together, totaled over $2,700,000, and the first time that Dominy disclosed that certain of the loans incurred by the projects with third-party lenders were in default.

42.    Despite persistent requests from the investors, Dominy has failed to produce any loan documentation, promissory notes, or other supporting documentation of having actually made any the alleged loans.

43.    In other words, the April 15, 2025, investor letters revealed that all of the projects had collapsed or were on the verge of collapse and were now saddled with unsustainable debt obligations to Chasseur and Dominy (or their affiliates). This simultaneous collapse indicates that the projects were essentially operated as one large project, and when one domino fell, the other projects were positioned to fall behind it.

44.    The Partnership Agreements, at Section 17.1(d), expressly prohibit the companies from incurring debt other than the initial financing related to each project that was set forth in each CIP's sources and uses.

45.    At some point in April or May of 2025, the lender foreclosed on the Valdosta Project, and no money was returned to investors. Dominy never provided the investors with any of the communications or notices received from the lender; nor did he make the investors aware of any of the discussions leading up to the foreclosure. Upon information and belief, Chasseur and Dominy secretly negotiated a deal with the lender to release Dominy from his personal guarantee in exchange for not making any effort to oppose the foreclosure.

46.    Naturally, investors in the various projects eventually began asking questions and demanding to see financial information.

47.    On June 1, 2025, Dominy sent the investors a spreadsheet detailing the amount of the amount of his purported loans, but Dominy did not

12

provide any supporting documentation for the loans despite persistent requests from the investors.

48. Dominy also provided no explanation of the use these loans. For example, the Fondren Hill financials for the twelve-month period ending June 30, 2025, show approximately $400,000 in net income. Yet, Dominy purports to have loaned the company over $1,000,000.

49. Additionally, the loans that Chasseur and Dominy allegedly made to Fondren Hill date back at least to 2022, meaning that Chasseur and Dominy were purporting to make unauthorized and undisclosed loans to the Fondren Hill Project while simultaneously raising funds for other projects by distributing CIPs expressly stating that the projects would not incur any such debt.

50. In May and June of 2025, a group of investors, including Burr, began asking for financial information to support the many claims that Dominy had made related to loans, repairs, working capital, etc.

51. Burr and the other investors were able to obtain some financial information, but what Dominy provided only raised more questions. Specifically, the investors were unable to confirm when and where the working capital reserves were deposited or used, whether any meaningful repairs were made from the repairs reserve, and whether any of the loans Dominy supposedly made to the projects were actually made.

13

52.   This culminated in an email exchange on June 9, 2025, in which one of the investors directly accused Dominy of absconding with the working capital reserves. Dominy responded "[i]f I stole so much money, why did I have to sell my Porsche? Put a loan on my debt free vacation home? Then sell my vacation home? Then place a second $300,000 secondary loan on my primary residence??"

53.   Yet, Dominy continued to avoid the substantive issue underpinning the investors' questions—i.e., where did all this money go?

54.   On July 15, 2025, Dominy sent out an investor letter related to the Fondren Hill Project disclosing that the loan was still in lockbox and that Dominy was still pursuing a sale of the Fondren Hill Project.

55.   Burr and the other investors were able to obtain some bank statements for some of the project accounts, which confirmed money was being funneled from the project-level accounts to the "big account", named Chasseur Realty Investors Business Checking, and other business accounts.

56.   For example, the May 2025 bank statement for the Fondren Hill Project's Wells Fargo account shows multiple transfers to Chasseur Realty Investors Business Checking, Dominy R Everyday Checking, and other project accounts:

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 5/1 | | Transfer From Brk ****0981 Ref# 522749830 | 100,000.00 | | |
| 5/1 | | Online Transfer to Chasseur Realty Investors-The Drake Lp Business Checking xxxxxx2925 Ref #Ib0N32Kbpq on 05/01/24 | | 35,000.00 | 73,224.93 |
| 5/3 | | Online Transfer to Chasseur Realty Investors- Business Checking xxxxxx6406 Ref #Ib0N3Wqx2G on 05/03/24 | | 13,000.00 | |
| 5/3 | | Online Transfer to Chasseur Realty Investors- Business Checking xxxxxx6406 Ref #Ib0N3Xlmbf on 05/03/24 | | 2,000.00 | 58,224.93 |
| 5/6 | | Online Transfer From Chasseur Realty Investors-The Drake Lp Business Checking xxxxxx2925 Ref #Ib0N47Xczm on 05/04/24 | 15,000.00 | | |
| 5/6 | | Online Transfer to Dominy R Everyday Checking xxxxxxxxx7863 Ref #Ib0N4Qxl4H on 05/06/24 | | 10,000.00 | |
| 5/6 | | Chase Credit Crd Epay 240504 7497058747 Robert M Dominy | | 5,000.00 | 58,224.93 |
| 5/8 | 1971 | Check | | 1,196.64 | 57,028.29 |
| 5/15 | | eDeposit IN Branch 05/15/24 09:15:08 Am 721 N Hammonds Ferry Rd Linthicum MD 1876 | 17,072.57 | | |
| 5/15 | | Online Transfer to Chasseur Realty Investors Business Checking xxxxxx7676 Ref #Ib0N7Hnqkx on 05/15/24 | | 30,000.00 | 44,100.86 |

57.   Dominy has provided no explanation for the large transfers to other projects, Dominy R Everyday Checking, or Chasseur Realty Investors Business Checking. It is notable that the Fondren Hill Project is in lockbox with its lender for failure to meet certain financial covenants, while simultaneously making large, unexplained cash transfers to other entities.

58.   Having only received a woefully incomplete picture of the financials from Dominy, Burr continued to press Dominy for the bank statements and financials that would complete the picture—specifically, the statements from the Chasseur Realty Investors Business Checking account.

59.   When asked why Dominy continued to resist providing those statements, Dominy's email response, on July 16, 2025, was "[b]ecause it is unnecessary. Any competent accountant can just follow the inflows and outflows and answer every question."

60.     Dominy's response is emblematic of the entire fraudulent scheme because it ignores at least two crucial points. First, Dominy is prohibited from commingling these project funds by the Partnership Agreements. Second, no accountant could make a reasonable determination of the actual financial condition of the various projects with only one side of the ledger. Any true financial analysis of the project would necessarily require, not just review of the project-level account, but also review of the other accounts that were receiving large transfers from the project-level account. Without that crucial piece of the puzzle, the investors were left to guess how those funds might have been used.

61.     Communications from Dominy to Burr and (to Burr's knowledge) the other investors largely ceased after July of 2025, Dominy sent a quarterly investor letter (the first in nearly a year) on May 4, 2026 for the Fondren Project, the Flats Project and the Drake Project. The May 4th letters state that the lenders foreclosed on the Flats and Drake Projects with no money expected to be returned to the investors. The May 4th letter for Fondren indicates that Dominy has the Fondren Hill Project under contract to sell it to a third party, but he is not confident that sale will close due to the issues with the lender.

62.     If Dominy is able sell the Fondren Hill Project, there is virtually no chance any investors will receive any money from the sale, as Dominy is clearly positioning Chasseur as second in line after the primary lender to

receive all net proceeds from the sale. Yet, it remains unclear if Dominy ever loaned any funds to the Fondren Hill Project at all; if he did, it was in violation of the Partnership Agreement; and Dominy has never addressed the large transfers made by the Fondren Hill Project to Dominy's other accounts.

63.    On May 4, 2026, counsel for Burr sent Dominy and Chasseur a letter demanding that they take corrective action as it relates to the multiple breaches of the partnership agreement for the Fondren Hill Project. Because Dominy and Chasseur exercise complete control over the Fondren Hill Project, any demand for Dominy and Chasseur to cause Fondren Hill to sue Dominy and Chasseur is futile. Regardless, Dominy and Chasseur responded to the letter affirming that they will not take any corrective action or pursue the derivative action contemplated by this complaint.

CAUSES OF ACTION

*Securities Fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5*

64.    For the reasons set forth above (which are specifically incorporated here), as to the Williams Project, the Valdosta Project, the Flats Project, the Woodlake Project and the Drake Project, Chasseur and Dominy knowingly made untrue statements of material fact and omitted material facts necessary to make the CIP statements not misleading, as follows:

17

a. representing that substantial funds would be set aside for working capital and repairs and maintenance, yet never expending or reserving those funds for the relevant project;

b. representing that funds raised for the projects would not be commingled with other funds, yet consistently commingling the funds without any appropriate accounting;

c. representing that no debt would be incurred by the projects outside of the initial loans, yet treating all money transferred to the projects as loans by Chasseur or Dominy even where the bank records show more money (on a net basis) being transferred from the project to Chasseur and Dominy; and

d. representing that accurate capital accounts would be maintained for each investor.

65. Burr relied on those misrepresentations in determining whether to invest in these projects. Had Burr known that the projects would be undercapitalized from the beginning without clear accounting of the uses of his investment or that Chasseur and Dominy would be able to recast project funds as personal loans to jump the line in front Burr and other investors in recovering money from the projects, Burr would not have invested.

66. Chasseur and Dominy never intended to set aside and appropriately segregate the funds for each project as they represented in the

18

CIPs, as evidenced by the prompt consolidation and commingling of the project funds.

67. Burr has been damaged by Chasseur's and Dominy's misrepresentations. Of these projects, at least one has been foreclosed on, others are in current default with their lenders, and there is no path to returning money to investors.

68. Chasseur and Dominy are, therefore, liable through this civil action authorized by Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. sec. 78j(b).

69. Dominy is also liable under Section 20(a) of the Securities Exchange Act of 1934 because he controlled Chasseur and the entities.

### *Material Misrepresentations*

70. As to the Fondren Hill Project, Chasseur and Dominy are liable to Burr for the tort of fraudulent misrepresentation.

71. At the time of Chasseur's and Dominy's solicitation to Burr to invest in the Fondren Hill Project, Chasseur and Dominy made the following misrepresentations to Burr in the CIP for the Fondren Hill Project and omitted material facts necessary to make the CIP statement not misleading, as follows:

   a. representing that substantial funds would be set aside for working capital and repairs and maintenance, yet never expending or reserving those funds for the relevant project;

b. representing that funds raised for the projects would not be commingled with other funds and that separate accounts would be maintained for each project, yet consistently commingling the funds without any appropriate accounting;

c. representing that no debt would be incurred by the projects outside of the initial loans, yet treating all money transferred to the projects as loans by Chasseur or Dominy even where the bank records show more money (on a net basis) being transferred from the project to Chasseur and Dominy; and

d. representing that accurate capital accounts would be maintained for each investor.

72. At the time of Chasseur's and Dominy's solicitation to Burr to invest in the Fondren Hill Project, Chasseur and Dominy knew that they would be using the funds that should have been set aside for working capital and repairs and maintenance for other purposes, depositing those funds into the Chasseur Realty Investors Business Checking account and other accounts, never clearly accounting for where the funds were or how they were used for the Fondren Hill Project, and that what money was transferred back to the Fondren Hill Project would be recast as loans from Chasseur and Dominy.

73.    Burr had the right to rely, and did rely, on the material misrepresentations presented by Chasseur and Dominy in the CIP when Burr decided to invest in the Fondren Hill Project.

74.    Burr was damaged because of his reliance. The Fondren Hill Project is in lockbox with its lender and is currently for sale, with Chasseur and Dominy positioned to recoup any net proceeds of the sale in reimbursement of alleged loans.

75.    Alternatively, if the material omissions and misrepresentations do not rise to the level of fraud, they were nonetheless negligent misrepresentations for which Chasseur and Dominy are liable.

### *Breach of Contract*

76.    As to the Fondren Hill Project, Chasseur, as general partner, breached the Partnership Agreement[2] by commingling funds, which is prohibited by Sections 17.1(h) and (o) of the Partnership Agreement, loaning money to the Fondren Hill Project, which is prohibited by Section 17.1(d) of the Partnership Agreement, failing to provide cash basis financials on a monthly basis or audited financials on an annual basis, which is required by Section 6.1 of the Partnership Agreement, and failing to maintain accurate capital

---

[2] As noted above, although Chasseur Realty Investors – Jackson, LLC was formed as limited liability company in New Jersey, which is qualified to do business in Mississippi, the company operates under a Limited Partnership Agreement on a substantially identical form as all of the other relevant projects.

21

accounts for each investor, which is required by Section 3.3 of the Partnership Agreement.

77.    Chasseur is liable to Chasseur Realty Investors - Jackson, LLC for these breaches.

### *Bad Faith Breach of Contract*

78.    Chasseur had no arguable basis to commingle company funds or loan money to Fondren Hill, each of which is a direct contradiction to the terms of the Partnership Agreement.

79.    Chasseur, under the direction of Dominy, intentionally committed these breaches to prop up its other business interests and recast Chasseur's interest in Fondren Hill as that of a debtor, ensuring priority on any returns.

80.    By breaching the Partnership Agreement in this way, Chasseur and Dominy acted without any arguable basis and exhibited the type of conscious wrongdoing that constitutes bad faith.

### RELIEF DEMANDED

Chasseur and Dominy are liable for damages, including but not limited to:

    a. All compensatory damages to which Burr may be entitled pursuant to Mississippi law and Section 10(b) of the Securities Exchange Act of 1934 and the regulations promulgated thereunder,

b. Out-of-pocket damages

c. All consequential damages,

d. Injunctive relief prohibiting Chasseur or Dominy from distributing any proceeds from the sale of the Fondren Hill Project to Chasseur or Dominy, prohibiting further transfers, requiring segregation of funds, and requiring production of financial records,

e. Recission of Burr's investment,

f. Rescissory damages,

g. Disgorgement of ill-gotten gains,

h. An accounting of all company funds,

i. Constructive touch,

j. All other compensatory damages to which Burr may be entitled,

k. Punitive damages,

l. Attorney fees,

m. Costs of litigation,

n. Prejudgment interest, and

o. Post-judgment interest.

Dated: May 18, 2026.

24

/s/ *Grafton E. Bragg*
GRAFTON E. BRAGG (MSB #104821)
One of the Attorneys for Robert Burr

Grafton E. Bragg
BraggLaw, PLLC
1060 East County Line Road
Suite 3A-120
Ridgeland, MS 39157
601.624.1153
grafton@graftonbragglaw.com

Derrick S. Godfrey
Godfrey Law, PLLC
1704 N. State Street
Jackson, MS 39202
601.740.0982
derrick@godfreylawpllc.com